**COLORADO STATE BANK OF WALSH, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 104–85C.

United States Claims Court.

Oct. 5, 1989.

612

John Gelhausen, Lamar, Colo., atty. of record, for plaintiff.

John S. Groat, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Duane Ross, Dept. of Agriculture, of counsel.

## OPINION

HARKINS, Senior Judge:

Colorado State Bank of Walsh (the Bank) seeks to recover on a contract made by the Department of Agriculture, Farmers Home Administration (FmHA), to guarantee a loan made under the Emergency Agriculture Credit Adjustment Act of 1978.[1] The complaint, filed February 20, 1985, sought judgment in the amount of $350,000, plus interest in the amount of $263,836.03 accrued to January 11, 1985, and further interest from that date at the rate of $122.26 per day. Defendant's amended answer, filed February 12, 1986, raised four affirmative defenses: (1) negligent servicing of the loan; (2) forfeiture of claim under 28 U.S.C. § 2514 (1982) for fraud; (3) cancellation of contract because of common law fraud and misrepresentation; and (4) breach of the contract provision that prohibited "fraud or misrepresentation of which lender has actual knowledge at the time it became such lender."

Procedurally, this case has been complicated by widely disparate views of the facts involved in preparation of the application and the actions of the participants at the closing of the loan guaranteed by the FmHA. These facts concerned activities of the Bank's president, the borrower, and the FmHA county supervisor during the period February 26, 1980, through the closing on May 1, 1980.

Defendant filed a motion for summary judgment on March 17, 1986, that was based on allegedly undisputed contentions of fact applicable to the affirmative defenses other than negligent servicing of the loan. Plaintiff filed a cross-motion for summary judgment on April 10, 1986, to strike any defense based upon fraud and misrepresentation. Defendant's motion was grounded on facts that were conceded to permit disposition of the legal issues raised in the motions for summary judgment. Defendant reserved the right to dispute such facts in the event its motion failed. In addition to the issues of forfeiture and cancellation because of fraud and misrepresentation, the motion papers raised the issue of whether defendant was estopped to show that the county supervisor exceeded the scope of his authority in approving a guarantee in circumstances that involved a failure to comply with applicable FmHA regulatory procedures.

After argument on September 23, 1986, defendant's motion for summary judgment was denied on the ground that the facts asserted with respect to fraud and misrepresentation did not establish that defendant was entitled to a forfeiture under 28 U.S.C. § 2514, or that the Contract of Guarantee could be set aside because tainted by fraud of the Bank, or because of fraud and misrepresentation of which the lender had actual knowledge. Plaintiff's cross-motion, as to defendant's fraud and misrepresentation defenses, was allowed on the basis of the facts conceded for purposes of the motion. Subsequent proceedings establish that the facts asserted by defendant and by the Bank were erroneous. The question whether approval of the guarantee was within the scope of the county supervisor's authority was not resolved after the argument because material facts were in dispute as to that issue.

During pretrial preparation, after further discovery, defendant requested and was permitted to file a renewed motion for summary judgment. The renewed motion concentrated on the contention that the county supervisor had exceeded his authority because the Contract of Guarantee was not executed in accordance with controlling regulations and procedures. At argument on November 16, 1987, it became clear numerous material issues of fact were in dispute. Defendant's renewed motion, accord-

---

1. Pub.L. No. 95–334, Title II, §§ 201–11 (1978), 92 Stat. 429–33, *as amended.* *Reprinted* at 7 U.S.C. § 1947 (1982); 7 C.F.R. §§ 1980.501— 1980.582 (1980).

ingly, was denied. Disputed factual issues included: (1) the scope of the assistance rendered by the county supervisor to the borrower in the preparation of the loan application; (2) whether the loan application at the May 1, 1980, closing contained the appraisal report required by 7 C.F.R. § 1980.511(c)(6); and (3) the content of the phrase "current chattel appraisal" in 7 C.F.R. § 1980.511(c)(6)(iii), as defined in practice in Colorado by the FmHA and banks for cattle loans. Further discovery was undertaken by the parties, and a trial de novo on all questions was held during the period January 24, 1989—February 2, 1989.

The principal issues in this case center around actions of the borrower (W. Royce Moffett), the FmHA county supervisor (Christopher Wysock), and the Bank president (Marvin R. Daniels), during the period February 26, 1980, through May 1, 1980, and the actions Bank personnel took to service the loan during the period May 1, 1980, to December 31, 1981. During pre-trial preparation, each of the witnesses involved in the May 1, 1980, closing had been deposed two or more times. At trial, the testimony of each manifested an uncommon degree of selective recall for details that supported the position asserted by their party, and a corresponding failure of memory as to comparable details that undermined their position or that would advance the position of their opponent. Facts relevant to the amount of assistance the county supervisor allegedly provided to the borrower apparently had changed in succeeding depositions, and versions at trial differed from the facts that had been asserted in the motions for summary judgment. These fluctuating versions of the facts as to what occurred on May 1, 1980, the lack of recall for the sequence of significant events, when considered in the light of an extraordinary lack of seemingly routine documentation by both the lender Bank and the FmHA county office, make the testimony of these individuals highly suspect. The record establishes that the testimony of Messrs. Moffett, Daniels and Wysock as to the details of their actions during the February 26, 1980, to May 1, 1980, period lacks credibility.

FACTS

W. Royce Moffett had been a loan customer of the Bank since 1976. For 12 years prior to November 1976, he had been the FmHA county supervisor in Baca County, Colorado. In 1980, he was the chief agricultural loan officer and a vice president of the First National Bank, Springfield, Colorado.

Royce Moffett in 1980 also conducted a cow/calf agricultural operation. His herd was pastured at two locations: a ranch located approximately 190 miles from Springfield at Thatcher, Colorado, in Las Animas County (the Thatcher Ranch) and a ranch located in Baca County, 14 miles north of Springfield, Colorado, (the Springfield Ranch). The Thatcher Ranch consisted of approximately 15,000 acres, 8,475 acres of which were owned by Royce Moffett, and the balance was leased; the Springfield operation was on leased land. The herd at the Thatcher Ranch was commingled with cattle owned by his brother, Hubert Moffett, and with cattle owned by other relatives. Some cattle at Thatcher Ranch were owned jointly by Hubert and Royce Moffett. In a visit to the Thatcher Ranch in 1981, nine different brands were observed on the cattle.

In a cow/calf operation, the basic security for an operating loan is the livestock and equipment on hand when the loan is made, and livestock purchased with loan proceeds. Calves produced are treated as normal income security and may be sold to pay operating expenses (such as feed and pasture rent) and for the repayment of the loan. A profitable cow/calf operation requires a production rate of baby calves of at least 90 percent.

In addition to its accounts with Royce Moffett, the Bank had loan accounts with Hubert Moffett. On April 10, 1980, Hubert Moffett obtained a loan directly from the FmHA in the amount of $143,850 under the FmHA emergency assistance program. At some time between April 17 and April 23, 1980, Royce Moffett signed as a co-obligor on Hubert Moffett's loan. The security

agreement applicable to Hubert Moffett's loan is dated April 10, 1980; it also is co-signed by Royce Moffett. The security agreement required a pledge of all livestock "now owned or hereafter acquired by debtor, together with all increases, replacements, substitutions and additions thereto." The schedule of the security herd listed in the security agreement includes 60 cows with an explanatory notation: "These are W. Royce Moffett's cattle. They are his 1/2 of the partnership cattle which he is pledging as security." The Bank on May 1, 1980, was not aware that Royce Moffett had signed as a co-obligor on Hubert Moffett's $143,850 note, and had co-signed the security agreement.

On May 1, 1979, the Bank renewed Royce Moffett's line of credit to $187,000. This renewal was based on a note for $97,-000 with a maturity date of May 1, 1980, and a note for $90,000, with a maturity date of May 1, 1982. On June 1, 1979, a $10,000 payment reduced the $97,000 note to $87,000. On June 15, 1979, the Bank sold, by means of a participation agreement, 90 percent of the loans represented by the notes to the La Junta Production Credit Association (PCA). The amount of the participation was $159,300.

The Bank's records on Royce Moffett's account included a comment sheet and a ledger account. The PCA participation was not reflected on the Bank's comment sheet for the Royce Moffett account, and that record continued to show the Royce Moffett account at $177,000 as of June 1, 1979, and, after additional advances by the Bank, at $187,000 as of June 25, 1979. The Bank's records indicate that no payment had been made on the credit line from June 25, 1979, through May 1, 1980. The Bank's ledger for the Royce Moffett account, however, reflects the amounts involved in the PCA participation, and shows a balance of $27,700 on June 25, 1979. The Bank's outstanding balance with Royce Moffett on May 1, 1980, was $27,700.

During the period April 1, 1980, through May 1, 1980, on the Bank's ledger account, Royce Moffett was not at the lending limits for his account. Marvin Daniels testified that, in view of the PCA participation agreement, the Bank could have loaned Royce Moffett up to an additional $140,000 before the Bank's lending limit would have been reached.

In early 1980, Royce Moffett wanted to increase his cattle herd. The Bank declined to make a further loan for this purpose. Royce Moffett then explored his eligibility for a FmHA loan guarantee on an EE loan with Christopher Wysock and Marvin Daniels.

On or about February 26, 1980, Royce Moffett completed preparation of the papers required for a FmHA guarantee on a $350,000 loan to be made by the Bank. The following documents were prepared by Royce Moffett and dated February 26, 1980:

1. Application for Guaranteed Loan (form FHA 449–6);

2. A handwritten document captioned "Appraisal Of Chattel Property" (Moffett Inventory);

3. Request for Guarantee (form FmHA 1980–25); and

4. Lender's Certification (form FmHA 1980–32).

At the end of March 1980 or the beginning of April 1980, Christopher Wysock advised Royce Moffett that he was eligible for a guaranteed loan and that an application could be approved.

On April 23, 1980, Christopher Wysock went to the Thatcher Ranch to view the land and the livestock thereon. Mr. Wysock did not conduct a roundup of the cattle on that date and did not ascertain the number of cows in Royce Moffett's herd. On April 23, 1980, the Baca County committee certified Royce Moffett as eligible for an EE guaranteed loan.

Between April 23, 1980, and May 1, 1980, the Royce Moffett file maintained by the Baca County FmHA office was reviewed at the state office level, by Genie Hanes, FmHA State Office Management Assistant, and Paul Scott, FmHA District Director for southeast Colorado. Paul Scott was Christopher Wysock's immediate supervisor. Genie Hanes (apparently because

of Royce Moffett's 12–year tenure as Baca County supervisor) recognized the handwriting of Royce Moffett on the document captioned "Appraisal of Chattel Property". She advised Christopher Wysock that the Royce Moffett loan file should contain an appraisal done by a third party or a bank representative. Paul Scott, after his review of the Royce Moffett loan file and the county committee minutes, agreed that the loan guarantee was within the county supervisor's $350,000 signing authority, and could be approved by county supervisor Wysock.

On May 1, 1980, Royce Moffett, Christopher Wysock and Marvin Daniels met at the Bank to complete the documentation and to close the Contract of Guarantee on a $350,000 EE loan from the Bank to Royce Moffett. At that meeting, in addition to the documents dated February .26, 1980, the following documents, which had been completed by Royce Moffett after discussions with Christopher Wysock, were presented to Marvin Daniels:

5. Contract of Guarantee (form FmHA 1980–27);

6. Lender's Agreement (form FmHA 1980–38); and

7. Certification Approval to be signed by Royce Moffett, applicant, and Christopher Wysock, county supervisor.

On May 1, 1980, Marvin Daniels personally typed on page 5 of the Request for Guarantee the name of the Bank, his title as President, the Bank's IRS ID tax number, and the date "February 26, 1980". He signed the Request for Guarantee on May 1, 1980.

The Request for Guarantee contained on page 2 an "Appraiser's Certificate on Personal Property" which Marvin R. Daniels executed on May 1, 1980. The certificate recites that the personal property listed above, "was appraised by me at the values set forth opposite the description thereof", and bears the date February 26, 1980. Contrary to this certification, Marvin Daniels in fact had not appraised the property as of February 26, 1980, or as of May 1, 1980, and did not even know the number of or the value of Royce Moffett's herd.

The Request for Guarantee set forth the purposes for which guarantee loan funds were to be used for the first full operating year, and the amounts for such purposes. These were:

| PURPOSES | AMOUNT |
| --- | --- |
| Refinance Colorado State Bank | $192,000 |
| Purchase additional cows | $ 85,000 |
| Operating Expenses | $ 73,000 |

The debt repayment schedule on page 4 of the Request for Guarantee included, as due the first year, a Land Payment in the amount of $41,650. This was the amount remaining due on the purchase of Thatcher Ranch; the schedule did not identify the entity to whom the payment was owed.

On May 1, 1980, Marvin Daniels signed the Lender's Certification. This certification bore the date February 26, 1980, and stated in part:

2. Lender is unwilling to make such loan or line of credit advances without an FmHA guarantee.

\* \* \*

7. The requested loan or line of credit is necessary for the continuation of a viable farming or ranching operation, does not exceed the amount necessary to permit the loan applicant to continue such an operation, and will not be used to purchase land or to lease additional land which would increase the number of acres of the operation above the highest level operated during the year of application or the year preceding application, whichever is greater.

On May 1, 1980, Marvin Daniels executed the document captioned "Appraisal of Chattel Property" which had been written by Royce Moffett and which bore the date February 26, 1980. The information in this document had been assembled by Royce Moffett for another purpose. The document is an inventory that does not qualify as an independent appraisal by a qualified appraiser selected by the lender.

At the closing on May 1, 1980, Christopher Wysock executed the Contract of Guarantee, which bears the date May 1, 1980, and the Lender's Agreement, which bears the date May 1, 1980. The Contract

guaranteed 90 percent of the principal balance owed at any one time on advances made by the Bank to Royce Moffett within the approved line of credit ceiling of $350,000. As county supervisor, Christopher Wysock had express authority to approve loan guarantees up to $350,000.

The Contact of Guarantee, a form that provides for execution only by a representative of the FmHA, includes the following express conditions:

1. *Loan Servicing*

   Lender will be responsible for servicing the entire loan, and Lender will remain mortgagee and/or secured party of record.

2. *Priorities*

   The entire loan will be secured by the same security with equal lien priority for the guaranteed and unguaranteed portions of the loan. The unguaranteed portion of the loan will not be paid first nor given any preference or priority over the guaranteed portion.

3. *Full Faith and Credit*

   The Contract of Guarantee constitutes an obligation supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which Lender has actual knowledge at the time it became such Lender or which Lender participates in or condones. In addition, the Contract of Guarantee will be unenforceable by Lender to the extent any loss is occasioned by the violation of usury laws, use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security regardless of the time at which FmHA acquires knowledge of the foregoing. As used herein, the phrase "use of loan funds for unauthorized purposes" refers to the situation in which the Lender in fact agrees with the borrower that loan funds are to be so used and the phrase "unauthorized purpose" means any purpose not listed by the Lender in the completed application as approved by FmHA.

The Lender's Agreement, a FmHA form that was executed by the Bank and the county supervisor, repeats the full faith and credit provision of the Contract of Guarantee, and authorizes a sale of the guaranteed loan by participation. In such event the lender is required to retain the note, collateral securing the note, and all responsibility for loan servicing and liquidation. The Lender's Agreement lists 11 servicing responsibilities to be performed by the Bank. These responsibilities included:

— Receiving all payments on principal and interest on the loan advances as they fall due.

— Inspecting the collateral as often as necessary to properly service the loan.

— Assuring that: taxes, assessment or ground rents against or affecting collateral are paid; the loan and collateral are protected in foreclosure, bankruptcy, receivership, insolvency, condemnation, or other litigation; insurance loss payments, condemnation awards, or similar proceeds are applied on debts in accordance with lien priorities on which the guarantee was based, or to rebuilding or otherwise acquiring needed replacement collateral with the written approval of FmHA; proceeds from the sale or other disposition of collateral are applied in accordance with the lien priorities on which the guarantee is based, except that proceeds from the disposition of collateral, such as machinery, equipment, furniture or fixtures, may be used to acquire property of similar nature in value up to $10,000 without written concurrence of FmHA; the Borrower complies with all laws and ordinances applicable to the loan, the collateral and/or operation of the farm or ranch.

— Providing FmHA a statement certified by an officer of the Lender of the unpaid principal balance of the guaranteed loan annually as of December 31.

— Obtaining from the Borrower periodic financial statements under the following schedule: quarterly. Lender is responsible for analyzing the financial statements, taking any servicing actions needed, and providing copies of state-

ments and record of actions to the County Supervisor.

The Lender's Agreement provides the following procedure in case of default:

A. The Lender will notify FmHA when a Borrower is thirty (30) days past due on a payment and is unlikely to bring its account current within sixty (60) days, or if the Borrower has not met its responsibilities of providing the required financial statements to the Lender or is otherwise in default. A meeting will be arranged by the Lender with the Borrower and FmHA to resolve the problem. Actions taken by the Lender with concurrence of FmHA may include but are not limited to any curative actions contained in either Subpart C or F of Part 1980, as applicable or liquidation.

Additional loans or advances are subject to the following condition:

The Lender will not make additional expenditures or new loans without first obtaining the written approval of FmHA even though such expenditures or loans will not be guaranteed.

A Guaranteed Loan Evaluation (form FmHA 449–20) is dated May 1, 1980, and was executed by Christopher Wysock on that date. The document in evidence is handwritten. It had been prepared before the meeting. Paragraph 10 of the Guaranteed Loan Evaluation form provides for the county supervisor's comments on adequacy of security, appraisals and a determination if additional security will be required. Paragraph 10 states: "I am requesting that a non-partisan appraisal be made by a bona fide appraiser on machinery and livestock." The need for an appraisal was discussed by the parties at the May 1, 1980, meeting. Christopher Wysock was aware that the document captioned "Appraisal of Chattel Property" was an inventory that had been·prepared by Royce Moffett and that the property had not been appraised by an independent party. At the May 1, 1980, closing, the parties agreed that a cattle appraisal was needed and that the Bank would make an inspection in conjunction with the purchase of additional cattle with the loan funds.

The cattle inspection arranged at the closing was performed by Marvin Daniels and Royce Moffett on May 20 and 21, 1980. The inspection included both the Thatcher Ranch and the Springfield operation. A roundup was not conducted, and a complete count of the security herd was not made. Royce Moffett purchased 122 cows on May 21, 1980, with an advance from the loan fund. These cows were not included in the Bank's inspection.

Royce Moffett executed a promissory note payable to the Bank that bears the date May 2, 1980, and is in the amount of $350,000, at a variable rate of prime plus 2 percent, payable annually on May 1, with final payment due on May 1, 1987. The note recites it is secured by a Security Agreement dated May 2, 1980, that covers: Machinery, Cattle and Feed, and is 90 percent guaranteed by FmHA. The note contains a table that includes: Amount Financed—$350,000.00; Finance Charge—$271,627.40; and Total of Payments—$621,627.40.

The Security Agreement and Financing Statement, dated May 2, 1980, and executed by Royce Moffett, states it is to secure the payment of the indebtedness evidenced by a Line of Credit Note payable to the Secured Party [Bank] in the amount of $350,000 due May 1, 1987, at 18 percent. The Security Agreement states, in part:

Debtor, for consideration, hereby grants to Secured Party a security interest in the following property, and any and all property of like type now owned or hereafter acquired by Debtor, together with all additions, accessions, substitutions, proceeds and products therefrom, including natural increase of livestock, all herein called the Collateral.

Between February 26, 1980, and the May 1, 1980, closing, Royce Moffett's herd had been decreased by losses due to theft, brucellosis (Bang's Disease) and severe storm conditions. In addition, some of the stock was sold by Royce Moffett. He testified that between February 26, 1980, and May 1, 1980, yearlings worth approximately $30,000 were sold to pay operating expenses. Cattle losses from a blizzard ap-

proximated $10,000. On March 25, 1980, Royce Moffett sold 28 of his partnership yearlings. In April 1980, 21 pairs of cows and baby calves were stolen, with a value of approximately $17,850.

Royce Moffett's herd at Springfield was quarantined for brucellosis from March 15, 1979, to December 8, 1980. On May 1, 1980, Mr. Daniels was unaware that the herd in Springfield was under quarantine for Bang's Disease. Mr. Daniels was not aware of any other brucellosis outbreak in Baca County at this time.

A count of Royce Moffett's herd, which is needed to establish and keep track of the basic livestock security and the normal income security for the loan, was complicated by the nature of the terrain at the Thatcher Ranch. Thatcher Ranch was large and the land was broken by canyons, mountains, and valleys. Certain areas were inaccessible by any type of motorized vehicle. Cows and calves were hidden by thick piñon and pine trees. A roundup at calving time posed risks that the calves would be separated from the cows and would cause stress to the herd.

The Springfield operation was terminated after the herd was liquidated in July and August 1980 because of Bang's Disease. Royce Moffett sold 19 cows on July 17, 1980, and on August 14, 1980, he sold 54 cows and 19 calves. Royce Moffett's operations at Thatcher Ranch continued until December 1983.

In August 1982, after the May 2, 1982, payment was not made, the Bank began foreclosure proceedings on the Thatcher Ranch. In September 1982, however, the herd at Thatcher Ranch was quarantined for brucellosis, and the Bank decided to suspend foreclosure proceedings until the brucellosis was cleared up. After the quarantine was lifted, the cattle were liquidated in November 1983. In December 1983, Royce Moffett's equipment, which was security for the loan, was sold.

At the closing on May 1, 1980, and throughout the period to final liquidation of the herd in November 1983, no accurate count was made of the security herd by any of the parties involved. The Bank's inspection on May 20–21, 1980, was a field inspection in which admittedly all of the cows and calves were neither seen nor counted. The commingled herds were not separately identified. The May 20–21, 1980, inspection was not adequate to establish an appraisal of the size and value of the herd that was supposed to be security for the loan.

Although the Bank and the FmHA supposedly kept running records of changes in composition of the herd, no such exhibit prepared by either the Bank or the FmHA is in evidence. During the trial, Marvin Daniels on January 26, 1989, prepared exhibits which purported to reconcile the cattle numbers as of the May 20, 1980, inspection. The basis for these figures was extremely questionable, and the attempted reconciliation is not valid.

The record contains a handwritten exhibit captioned: "W.R. Moffett Cattle Accounting" (Moffett Accounting). This exhibit was prepared in 1984 after the Bank's foreclosure action, and during the administrative proceeding on the Bank's Report of Loss. It was attached as an exhibit to a letter dated November 20, 1984, from the Bank's counsel in the Bank's appeal to the FmHA Administrator. The Moffett Accounting is based upon information and records that have been destroyed or are not in evidence. The figures on this exhibit reflect information that was contained in Royce Moffett's record book. Although Royce Moffett testified that he believed the figures for the most part were accurate, he admitted the numbers did not reflect an actual count of the cattle.

During the semi-annual roundups, Royce Moffett maintained a tally book which did reflect actual counts. Royce Moffett testified that in June or early July 1980 a roundup was conducted and an actual count of the herd was made at that time. He also testified that he had the tally book for the June–July 1980 roundup. The tally book apparently was never examined by the Bank or by the FmHA, and it was not obtained during discovery in this case.

The Moffett Accounting exhibit admittedly may be inaccurate, and it is of minimal value to establish precisely the size of the security herd as of any particular date.

It has more claims to accuracy, however, and it is more comprehensive, than any exhibit in evidence that was maintained by the Bank or by the FmHA. The FmHA in the administrative appeal accepted as a starting point the herd counts reflected in the Bank's May 20–21, 1980, inspection.

The following table (Table 1) shows the variations, during the period February 26, 1980, through the May 20–21, 1980, inspection, in the counts and valuations of the herd that was supposed to be the security herd for the guaranteed loan. The table also shows the decrease in head count and valuation disclosed in the September 1, 1981, inspection by Marvin Daniels for the Bank.

TABLE 1

| REPRESENTATIONS AS TO ROYCE MOFFETT HERD | | | | |
|---|---|---|---|---|
| Date | Source | Type | Count | Value |
| 2/26/80 | Application for Guaranteed Loan | st & hr | 258 | $ 90,480 |
| | | cows | 290 | $188,500 |
| | | bulls | 14 | 16,800 |
| | | Total | | $295,780 |
| 2/26/80 | Appraisal of Chattel Property (Moffett Inventory) | heifers | 78 | $ 28,080 |
| | | steers | 80 | 32,400 |
| | | calves | 100 | 30,000 |
| | | cows | 230 | 149,500 |
| | | cows* | 120 | 39,000 |
| | | bulls | 18 | 15,800 |
| | | (*½ int.) Total | | $294,780 |
| 2/26/80 | Request for Guarantee | cows* | 290 | $188,500 |
| | | calves | 258 | 90,480 |
| | | Total | | $278,980 |
| | | cows** | 100 | 85,000 |
| | (*now owned) (**to be purchased) | Total | | $363,980 |
| 5/1/80 | Guaranteed Loan Evaluation | Livestock (Lender) | | $282,500 |
| | | Livestock (FmHA) | | $226,000 |
| 5/2/80 | Security Agreement and Financing Statement | heifers | 78 | $ 28,470 |
| | | steers | 80 | 32,800 |
| | | baby calves | 100 | 30,000 |
| | | cows | 290* | 188,500 |
| | | bulls | 18 | 16,000 |
| | | Total | | $295,770 |
| | | (*including 60 partnership) | | |
| 5/20–21/80 | Livestock* Inspection Report** (Daniels) | Cows | 326 | $211,900 |
| | | baby calves | 99 | 19,800 |
| | | yr. calves | 110 | 35,750 |
| | | bulls | 19 | 15,200 |
| | (*excluding partnership cows) (**Thatcher & Springfield locations) | Total | | $282,650 |

| Date | Source | Type | Count | Value |
|---|---|---|---|---|
| 9/1/81 | Livestock* Inspection Report (Daniels) | cows | 223 | $111,500 |
| | | calves | 209 | 62,700 |
| | | bucket calves | 15 | 3,750 |
| | | bulls | 17 | 17,000 |
| | (*excluding 59 pairs of partnership cows/calves) | Total | | $194,950 |

The following table (Table 2) shows the changes in the herd from May 1, 1980, to December 31, 1981, as reflected in the Moffett Accounting exhibit. During this period, 145 cows and 124 yearlings were added by purchase. During this period the herd was substantially depleted by the sale of 207 cows.

## TABLE 2

### CHANGES IN ROYCE MOFFETT HERD AFTER MAY 1, 1980 TO DEC. 31, 1981
### (Moffett Accounting)

| Date | Event | Cows | Calves | Steer/Heifer-Yearlings | Bulls |
|---|---|---|---|---|---|
| 5/15/80 | Sale | −3 | | | −2 |
| 5/21/80 | Purchase | +122 | | | |
| 6/14/80 | Death | −4 | | −16 | |
| 7/17/80 | Sale | −19 | | | |
| 8/14/80 | Sale | −54 | −19 | | |
| 8/14/80 | Purchase | | | +124 | |
| 6/1–12/31/80 | Death | −9 | | | |
| 10/17/80 | Sale | | | −24 | |
| 12/3/80 | Sale | | | −16 | |
| 12/31/80 on hand | | 318 | 190 | 157 | 16 |
| 1/15/81 | Sale | | | −126 | |
| 3/16/81 | Sale | −27 | −9 | | |
| 3/16/81 | Purchase | +23 | | | |
| 3/16/81 | Sale* | −26 | −165 | −30 | |
| 4/81 | Death | −16 | −15 | | |
| 5/81 | Stolen | −23 | −15 | | |
| 6/20/81 | Sale | | | | −1 |
| 7/27/81 | Sale | −11 | −2 | | |
| 8/5/81 | Sale | −11 | −2 | | |
| 8/25/81 | Sale | −7 | | | |
| 10/14/81 | Sale | −12 | | | −2 |
| 10/29/81 | Sale | −39 | | −2 | |
| 12/1/81 | Sale | | −181 | | |
| 5/81–12/81 | Death | −9 | | −8 | −1 |
| | Butchered | | | −3 | |
| *partnership | | | | | |
| 1/1/82 on hand | | 160 | 0 | 0 | 12 |
| | Total Additions | 145 | 0 | 124 | 0 |
| | Total Deletions | 270 | 408 | 225 | 6 |

On May 2, 1980, the Bank established a payment schedule for the guaranteed loan. The loan was set up for 7 years on a variable rate (prime plus 2 percent) with annual payments as follows:

| | |
|---|---|
| May 1, 1981 | Interest payment only |
| May 1, 1982 | $40,000 principal payment plus interest |
| May 1, 1983 | $70,000 principal payment plus interest |
| May 1, 1984 | $80,000 principal payment plus interest |
| May 1, 1985 | $90,000 principal payment plus interest |
| May 1, 1986 | $40,000 principal payment plus interest |
| May 1, 1987 | $30,000 principal payment plus interest |

Shortly after the guaranteed loan was made, economic conditions in Colorado changed. The cattle market deteriorated and the substantial reductions in cattle prices had a concomitant impact on ranch land real estate values. Many ranches lost up to 50 percent of appraised value. Loan defaults were common in banks that specialized in agricultural loans. One of the three banks in Baca County failed, and the FmHA Baca County office in 1981 and 1982 had delinquencies on loans in a range of 40 to 60 percent.

The Bank's records concerning Royce Moffett's guaranteed loan are incomplete and incoherent. The Bank had few employees; the loan officers did their own typing on the account comment sheets. The comment sheet was a chronological record of changes in the account balance resulting from events that the officer considered to be noteworthy. The comment sheet admittedly did not contain a complete record of all transactions that involved a particular line of credit. Analysis of activity as to any individual loan required references to other bank records. These records also were incomplete. The comment sheet in the record of this case on the Royce Moffett account appears to have one or more pages missing. Marvin Daniels testified that he made entries on the Royce Moffett account comment sheet during the period March 20, 1981, through October 31, 1981, relative to the guaranteed loan. The exhibit in evidence, however, has an entry for March 20, 1981, at the bottom of a page, and on the succeeding page the first entry was for November 13, 1981. Bank officials had no explanation that was adequate to account for the entries made by Marvin Daniels that were missing.

The Bank also maintained a ledger account for Royce Moffett. During the relevant period, the Bank made advances and loans to Royce Moffett that are claimed to be outside and separate from the guaranteed loan. The comment sheet and the ledger account do not handle these transactions in a consistent manner. On the comment sheet, Marvin Daniels, in the entry for August 20, 1980, noted that $20,000 was charged against the guaranteed line of credit to purchase 150 heifers. The ledger account, however, describes this transaction as loan # 7165, and as separate from loan # 6851, the guaranteed loan.

An interest payment was scheduled to be made on May 1, 1981. A payment was not made on that date. On December 1, 1981, however, a payment was made which the Bank applied to the delinquent interest payment. The Lender's Agreement required the Bank to notify FmHA when an interest payment was 30 days past due and the account is unlikely to be current within 60 days. The Bank did not give FmHA notice of the failure to make the May 1, 1981, payment.

The Lender's Agreement required the Bank not to make additional expenditures or new loans without the written approval of FmHA. The Bank never obtained written approval from FmHA for any of the loans it now contends are separate from and additional to the guaranteed loan.

Table 3 shows the funds that the Bank transferred to Royce Moffett after May 1,

1980. The table identifies the loans that plaintiff contends are separate from the guaranteed loan. The total funds made available to Royce Moffett by the bank after May 1, 1980, were $466,812. The excess loans totaled $116,812.

TABLE 3

FUNDS TO ROYCE MOFFETT AFTER MAY 1, 1980

| Date | Amount | Use |
|---|---|---|
| 5/2/80 | $215,000 | $187,000 – Refinance principal amount of preexisting debt to Bank |
| | | $ 28,000 – Accrued interest on preexisting debt to Bank |
| 5/12/80 | $ 20,000 | Advance – use unspecified |
| 5/21/80 | $103,000 | $ 79,300 – to purchase 121 cows |
| | | $ 22,700 – for pasture rent |
| 7/10/80 | $ 9,000 | Advance – use unspecified |
| 8/20/80** | $ 20,000 | Advance – to purchase heifers |
| 12/4/80** | $ 31,500 | Pay pasture and feed bills |
| 12/19/80 | $ 3,000 | Advance – use unspecified |
| 12/26/80** | $ 5,000 | Escrow on new loan |
| 1/23/81** | $ 35,000 | Renewal note, and to pay pasture and feed bills |
| 4/9/81** | $ 43,312 | Land payment due on Thatcher Ranch Bank took deed of trust as security |
| Total | $466,812 | |
| Total Excess | $116,812 | |

**(Plaintiff contends these are loans separate from the guaranteed loan.)

Table 4 shows the payments to the Bank after May 1, 1980, that were applied to the Royce Moffett account. Table 4 shows the payments made, and the source of the payment, during the period January 23, 1981, through December 31, 1982. The Table includes entries which the parties agree represent amounts that were applied to interest. The source of these payments is not stated; presumably, however, the source was sales of cattle and equipment during the period November 13, 1981, to April 20, 1984. The total payments to the account were $180,834.34. No amount was applied to principal; $66,757.35 was applied to interest; and $114,076.99 was applied to loans which the Bank contends were separate from the guaranteed loan.

TABLE 4

PAYMENTS TO THE ROYCE MOFFETT ACCOUNT AFTER MAY 1, 1980

| Date | Amount | Source |
|---|---|---|
| 1/23/81 | $56,500 | Sale of cattle in Jan. 1981 ($21,500)—Renewal note of $35,000 dated 1/23/81 to pay off 8/20, 12/4, and 12/26/80 loans. |
| 3/20/81 | $35,000 | Sale of calf crop |
| 11/13/81** | $18,637.14 | Not stated |
| 12/1/81** | $15,434.56 | Sale of 94 calves |
| 12/3/82 | $22,576.99 | Sale of calf crop |
| 12/3/82** | $15,713.87 | Sale of 45 cows and 98 calves |
| 7/25/83** | $ 1,071.34 | Sale of 4 cows |
| 11/8/83** | $11,072.28 | Not Stated |
| 11/30/83** | $ 550.00 | Not stated |
| 12/13/84** | $ 4,132.97 | Not stated |

| Date | Amount | Source |
|------|--------|--------|
| 4/20/84** | $ 145.19 | Not stated |

**Applied to interest
TOTAL PAYMENTS $180,834.34

| | | |
|---|---|---|
| | Applied to principal: | $ 00.00 |
| | Applied to interest: | $ 66,757.35 |
| | Applied to excess loans: | $ 114,076.99 |

---

The Lender's Agreement in Section IX. C.11 required the Bank to obtain financial statements quarterly from Royce Moffett. The Bank was made "responsible for analyzing the financial statements, taking any servicing actions needed, and providing copies of statements and record of actions to the County Supervisor." The record contains financial statements signed by Royce Moffett dated June 16, 1980, August 14, 1980, January 27, 1981, August 31, 1981, January 1, 1982, and November 23, 1982. The record does not contain a financial statement for first quarter 1981 or for second quarter 1981. No report was made to the FmHA concerning a failure to provide these financial reports.

Marvin Daniels testified that his analysis of the financial statements included preparation of a spreadsheet. The Bank has no records that document such an analysis. No exhibit in the trial record other than a Status Report dated January 2, 1981, purports to represent the Bank's analysis of any of the financial reports.

The herd counts in the financial statements differ from the herd counts in the various other exhibits related to the guaranteed loan, and from the herd counts in Marvin Daniel's inspection reports. Royce Moffett testified that the herd count in the August 14, 1980, financial statement was based on tally book figures that were obtained in the June–July 1980 roundup. The May 20–21, 1980, inspection report by Marvin Daniels shows 326 cows in the herd; the August 14, 1980, financial report shows 262 cows. From the standpoint of adequacy of the security, a 64 cow difference is significant.

The following table (Table 5) shows selected data from the financial statements. The cow count went from 370 in the June 16, 1980, statement to 262 in the August 14, 1980, statement. The cow count was 265, plus 58 registered Hereford cows, on January 27, 1981, and in the August 31, 1981, statement, cows and calves were combined to make a total of 288.

TABLE 5

### FINANCIAL STATEMENTS

| Date | Type | Livestock No. | Value | Total Assets | Net Worth |
|------|------|---------------|-------|--------------|-----------|
| 6/16/80 | Yearlings | 64 | $ 20,480 | $1,288,605 | $369,505 |
| | St/Hfr | 200 | $ 32,000 | | |
| | Cows | 310 | $201,500 | | |
| | " (½ int) | 120 | $100,750 | | |
| | Bulls | 18 | $ 21,600 | | |
| | TOTAL | | $376,330 | | |
| 8/14/80 | Calves (St/Hfr) | 280 | $ 84,000 | $1,354,837 | $403,937 |
| | Calves Hfr | 154 | $ 53,900 | | |
| | Calves St | 10 | $ 3,500 | | |
| | Cows | 262 | $170,300 | | |
| | Reg. Bulls | 14 | $ 25,200 | | |
| | TOTAL | | $336,900 | | |

| Date | Type | No. | Value | Total Assets | Net Worth |
|---|---|---|---|---|---|
| | Livestock | | | | |
| 1/27/81 | Heifers | 85 | $ 31,790 | $1,590,653 | $612,710 |
| | Steers | 95 | $ 38,665 | | |
| | Calves | 20 | $ 5,248 | | |
| | Cows | 215 | $139,750 | | |
| | "(½ int) | 100 | $ 32,500 | | |
| | Reg. Hereford cows | 58 | $ 40,600 | | |
| | Bred Hfr | 30 | $ 12,000 | | |
| | RgHr Bulls | 8 | $ 12,000 | | |
| | Brang Bulls | 10 | $ 12,000 | | |
| | TOTAL | | $324,553 | | |

1st and 2nd quarter reports for 1981 missing

| Date | Type | No. | Value | Total Assets | Net Worth |
|---|---|---|---|---|---|
| 8/31/81 | Cows & Calves | 232 | $165,800 | $1,742,350 | $688,850 |
| | Reg. Cows & Calves | 56 | $ 44,800 | | |
| | RgHr Bulls | 7 | $ 10,500 | | |
| | Brang Bulls | 10 | $ 13,000 | | |
| | TOTAL | | $234,100 | | |
| 1/1/82 | Reg. Bulls & Heifers | 29 | $ 10,150 | $1,683,200 | $690,700 |
| | St & Hfr | 9 | $ 2,250 | | |
| | Cows | 211 | $116,050 | | |
| | Reg. Hereford cows | 46 | $ 27,600 | | |
| | Reg. Hereford bulls | 9 | $ 10,500 | | |
| | Brang bulls | 7 | $ 9,100 | | |
| | Hereford bulls | 9 | $ 5,400 | | |
| | Hereford heifers | 13 | $ 5,200 | | |
| | TOTAL | | $186,250 | | |

No reports filed until

| Date | Type | No. | Value | Total Assets | Net Worth |
|---|---|---|---|---|---|
| 11/23/82 | Calves | 50 | $14,000 | $1,421,500 | $361,500 |
| | Cull cows | 10 | $ 3,500 | | |
| | Cull bulls | 3 | $ 2,400 | | |
| | RgHr cows | 34 | $18,700 | | |
| | Cows | 60 | $27,000 | | |
| | RgHr bulls | 9 | $ 7,200 | | |
| | TOTAL | | $72,800 | | |

---

On November 19, 1980, the new county supervisor (Keith Kasselder, who in September 1980 succeeded Christopher Wysock), in preparation to transfer the Hubert Moffett file to another FmHA office, conducted a field visit to the Thatcher Ranch. The purpose of the visit was to inventory all of the livestock on the ranch. Hubert Moffett personally participated in this field visit. The investigation was a field inspection and not a roundup. On the day of the visit, Hubert Moffett had collected most of his cattle in order to "work" his herd (branding, vaccinating, and in the case of bulls, castrating). Keith Kasselder's notes show a total of 437 cows on the Thatcher Ranch: 103 were identified as Hubert's; 177 were identified as partnership cows; and 157 cows were identified as Royce's. Partnership cows were allocated 60 to Hubert and 117 to Royce. On this basis, Keith Kasselder's notes show Hubert Moffett's herd included 163 cows and Royce Moffett's herd contained 274 cows at Thatcher Ranch on November 19, 1980.

In the May 20–21, 1980, inspection by Marvin Daniels, the count included 246 cows in Royce Moffett's herd at the Thatcher Ranch, exclusive of any partnership cows. On May 21, 1980, Royce Mof-

fett purchased 122 cows which subsequently were pastured on Thatcher Ranch. Keith Kasselder determined that the combined herds at the Thatcher Ranch were inadequate security to support both the direct loan to Hubert Moffett and the guaranteed loan to Royce Moffett. On November 20, 1980, Keith Kasselder advised Marvin Daniels that the cow count at Thatcher Ranch appeared to be short. At trial, Marvin Daniels denied any recollection of any such conversation with Keith Kasselder advising him of a shortage in Royce Moffett's cattle numbers.

In the FmHA Economic Emergency Loan Program, FmHA requires a year-end status report on a guaranteed loan. On January 2, 1981, Marvin Daniels submitted the Status Report for the year ending December 31, 1980. This report shows unpaid principal in the amount of $350,000 and unpaid interest in the amount of $34,009.50. Under the guaranteed loan, no interest payment was due until May 1, 1981. The Status Report shows that the total value of property owned was $1,354,837; indebtedness was stated to be $407,500; and the value of security for the line of credit was reported as $334,730. As of December 31, 1980, therefore, the bank was aware that the guaranteed loan was under-secured. The Status Report is based upon financial statements, but it is not equivalent to a financial statement. The January 27, 1981, financial statement for Royce Moffett shows the security herd as valued at $324,553. On either basis, a security value of either $324,553 or of $334,730 is not adequate to cover the $350,000 line of credit.

On December 19, 1983, the Bank initiated administrative action on the guarantee by submitting a report of loss (Loan Note Guarantee Report of Loss (form FmHA 449–30)). The entire $350,000 loan was reported as the principal balance owed, and accrued interest owed was stated at $145,519.77. The adjusted basic loss totaled $495,519.77, and the 90 percent guarantee produced the claim of $445,967.79 as the amount due the Bank. The Bank's loss on

the unguaranteed portion was stated at $49,551.98.

The FmHA state director rejected the claim on February 6, 1984, and confirmed the rejection on May 29, 1984, after the Bank had provided additional information. The Bank appealed the state director's denial of the claim to the FmHA Administrator. The FmHA Program Assistant to the Administrator denied the appeal on January 8, 1985, in a lengthy decision that set forth the reasons for the rejection. Basic to the decision is the conclusion that the Bank was negligent in servicing the loan as required by the terms of the Lender's Agreement and by FmHA regulations. The FmHA decision does not challenge the validity of county supervisor Wysock's decision to execute the Contact of Guarantee under the circumstances that were present during the February 26, 1980,—May 1, 1980, period.

In its January 8, 1985, decision, the FmHA accepted the Bank's May 20, 1980, inspection report as the basis for determining the size of the security herd: 326 cows, 209 calves and 19 bulls, plus the additional 122 cows purchased on May 21, 1980, with loan funds. The FmHA accepted a maximum total of 448 cows and 19 bulls as the "basic livestock security" for the loan.

The FmHA found that the records submitted by the Bank accounted for only 142 cows and 1 bull. Therefore, FmHA discounted the loss claim in an amount equal to the value of the 306 cows and 18 bulls not accounted for. This discount amounted to $124,555.32.

The FmHA also concluded that the Bank had made advances in the amount of $91,500 that exceeded the line of credit ceiling, of which $74,500 was to be discounted from the loss claim. The proceeds from these advances and loans, the FmHA held, first should have been applied to the guaranteed loan, and not to repay the Bank for advances and loans that exceeded the credit ceiling.

The FmHA calculations adjusted the Bank's claim to produce a reduced principal balance as follows:

| Principal Balance | | $350,000.00 |
|---|---|---|
| Less | | |
| Security unaccounted for | $124,555.32 | |
| Advances Above Credit Ceiling | 74,500.00 | $199,055.32 |
| Adjusted principal balance | | $150,944.68 |

---

The FmHA determined that December 31, 1980, was the earliest date the Bank knew the loan was undersecured and the date when the Bank should have taken action to protect its interest. December 31, 1980, was used as the benchmark for calculating interest on the unpaid principal, less the discounts.

The FmHA's final calculation of its liability under the guarantee was:

FmHA is liable to pay 90 percent of $150,944.68 discounted principal, plus $44,658.67 discounted interest, or a total adjusted basic loss of $176,043.02.

## DISPOSITION

The objective of the FmHA Economic Emergency Loan Program, authorized by the Emergency Agricultural Credit Adjustment Act of 1978, as amended, (the Act), was to make adequate financial assistance available in the form of loans insured or guaranteed by FmHA so that eligible farmers and ranchers could continue farming and ranching operations during the economic emergency. The maximum amount of a guarantee under the program was 90 percent of the principal and interest of the loan.[2] To be eligible for a loan guarantee, the Act specified that the applicant was "not able to obtain sufficient credit elsewhere due to economic stresses."[3] The Act listed 8 purposes for which loans could be guaranteed. As applicable to Royce Moffett's operation, the purposes were: (1) refinancing outstanding indebtedness, including the making of installment payments of principal and interest, (2) reorganization of the ranching operation, (3) purchase of essential water rights, (4) purchase of essential livestock, (5) purchase of feed, supplies and other operating expense items; (7) other essential ranch needs, and (8) loan closing costs.[4] The Act declared any Contract of Guarantee was "an obligation supported by the full faith and credit of the United States and incontestable except for fraud or misrepresentation of which the holder has actual knowledge at the time it becomes a holder."[5]

The authority granted by the Act was implemented in Departmental regulations that were comprehensive and detailed.[6] Under the regulations, the county supervisor was the focal point for the program,[7] and he had express authority to execute the Lender's Agreement and the Contract of Guarantee.[8] This authority was to be exercised "in accordance with applicable laws, and the regulations implementing these laws."[9]

In the loan making process, the lender's role was primary and the county supervisor's role was secondary. In loan making, the regulation specified that "it is the responsibility of the lender to ascertain that all requirements for making, securing, and servicing the loan are met."[10] Information required to be included in an application for a guarantee for a line of credit was listed in 13 items. Where chattel property was to serve as collateral for loans, the regulation provided such chattel property will be appraised by "a qualified appraiser selected

**2.** Act, § 208.

**3.** Act, § 202.

**4.** Act, § 203(a).

**5.** Act, § 208.

**6.** 7 C.F.R. §§ 1900.3—1900.5; 1980.1—1980.100; 1980.501—1980.582 (1980).

**7.** 7 C.F.R. 1980.501(b).

**8.** 7 C.F.R. § 1980.549(c).

**9.** 7 C.F.R. § 1900.3.

**10.** 7 C.F.R. § 1980.501(c).

by the lender", and the lender "was responsible for determining that appraisers have the necessary qualifications and experience to make appraisals." [11] The application also was required to include the "lender's plan for servicing the loan and providing management assistance to the borrower, including the steps necessary to see that the requirements of the loan agreement are met." [12] The regulation specified that the lender "is responsible for seeing that all available collateral is pledged and maintained and is in existence and is of record to protect the interest of the lender, the holder, and FmHA." [13]

■ In the FmHA EE program, the Contract of Guarantee is an element in a fiduciary relationship that imposes a duty on the lender to act as a reasonable and prudent banker.[14] The program essentially involves a business relationship. The Bank, in its lending function, is presumed to possess unique skills as to knowledge of local conditions, in this case the conditions in Baca County, relevant to the banking business and that such skill will be exercised with due care in the conduct of its business.[15]

The full faith and credit provision of the Act, as implemented specifically in both the Contract of Guarantee and in the Lender's Agreement, states that the Contract of Guarantee is an obligation that "is incontestable except for fraud or misrepresentation of which Lender has actual knowledge at the time it became such Lender or which Lender participates in or condones." Plaintiff argues that the Contract of Guarantee by its terms is incontestable except for fraud or misrepresentation, and that, after defendant's affirmative defenses of fraud and misrepresentation were stricken pursuant to plaintiff's cross-motion for summary judgment, validity of the Contract of Guarantee is not subject to further challenge.

Defendant's motion for summary judgment on the fraud and misrepresentation defenses rested on alleged facts that subsequently at trial were shown to be erroneous. The trial record does not establish that county supervisor Wysock assisted Royce Moffett in the preparation of the application documents to the extent the Bank asserts. Nor does the record establish that at the closing on May 1, 1980, county supervisor Wysock exerted pressure on Marvin Daniels, or that the reason county supervisor Wysock executed the Contract of Guarantee was due to reliance on action by Marvin Daniels. The trial record does establish that the borrower, the lender and the county supervisor orchestrated a transaction that was contrary to the objectives of the EE loan guarantee program, and of the requirements of the Act and FmHA regulations. The actions of the parties in this transaction, however, do not satisfy requirements applicable to the fraud and misrepresentation theories presented in the cross-motions for summary judgment.

FRAUD

■ The cross-motions for summary judgment were concerned with the following concepts: (1) fraud under the Forfeiture of Fraudulent Claims Act, (2) common law fraud, and (3) fraud and misrepresentation as used in the Contract of Guarantee. The Forfeiture of Fraudulent Claims Act provides that any person who corruptly practices any fraud against the United States in the proof, statement, establishment, or allowance of a claim, shall forfeit such claim to the United States.[16] The

---

11. 7 C.F.R. §§ 1980.501(c)(5) and 1980.-501(c)(6).

12. 7 C.F.R. § 1980.511(c)(10).

13. 7 C.F.R. § 1980.520(a).

14. *Everman National Bank v. United States,* 756 F.2d 865, 868–69 (Fed.Cir.1985).

15. *First National Bank, Henrietta v. SBA,* 429 F.2d 280, 287 (5th Cir.1970).

16. 28 U.S.C. § 2514, *as amended* (1982), provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Claims Court shall specifically find such fraud or attempt and render judgment of forfeiture.

elements of "fraud" as used in 28 U.S.C. § 2514, are not defined in the statute. The Court of Claims approached the issue of fraud in forfeiture of claims cases on a case-by-case basis, and applied the common law elements of fraud.[17]

The elements of common law fraud have been defined by the United States Court of Appeals for the Federal Circuit.

> "Common Law Fraud" requires (1) misrepresentation of a material fact, (2) intent to deceive or a state of mind so reckless respecting consequences as to be the equivalent of intent (scienter), (3) justifiable reliance on the misrepresentation by the party deceived, inducing him to act thereon, and (4) injury to the party deceived resulting from reliance on the misrepresentations.[18]

Evidence of fraud must be clear and convincing.[19] The "burden of proof rests upon defendant to make good the charge, and the circumstances are to be so clear and convincing that the mind can rest with safety upon the result." [20] In this case, county supervisor Wysock did not alter his conduct based on the false certification by Marvin Daniels, and he did not rely on the false certification. Marvin Daniels executed the application documents so that the Bank would obtain the loan guarantee, and reduce its potential exposure to loss with regard to the Bank's loans to Royce Moffett. His action, however, was based on his trust in Royce Moffett and in the county supervisor, and, although negligent, does not possess the indicia of fraud required for forfeiture.

Pursuant to common law, a contract tainted by fraud may be cancelled by the injured party. The facts developed at trial, however, show defendant failed to establish fraud, because there was no reliance at the closing on the actions of Marvin Daniels.[21]

The Contract of Guarantee, § 3, provides that the guarantee is "incontestable except for fraud or misrepresentation of which lender has actual knowledge at the time it became such lender or which lender participates in or condones." Fraud as used in the Contract of Guarantee is measured under common law definition. For the reasons stated above, Marvin Daniels' conduct at the closing does not meet the requirements for common law fraud.

## MISREPRESENTATION

■ An FmHA Contract of Guarantee may be voided by material misrepresentations of fact. Nondisclosure of information that is known and is vital to the soundness of the loan amounts to a material misrepresentation.[22] The elements of misrepresentation, as defined in Court of Claims prece-

**17.** See, e.g., McCarthy v. United States, 229 Ct.Cl. 361, 670 F.2d 996, 1005 (1982) (knowledge of falsity and intent to deceive); O'Brien Gear & Mach. Co. v. United States, 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979) (deliberate knowing intent to deceive); Miller v. United States, 213 Ct.Cl. 59, 550 F.2d 17, 22 (1977) (negligence and ineptitude not enough—must prove blatant intent to deceive); Acme Process Equip. Co. v. United States, 171 Ct.Cl. 324, 347 F.2d 509, 526 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (must establish affirmative intent to defraud); Wagner Iron Works v. United States, 146 Ct.Cl. 334, 174 F.Supp. 956 (1959) (forfeiture for presentment of false vouchers to secure funds which plaintiff knew it was not entitled to); Crovo v. United States, 100 Ct.Cl. 368 (1943) (no forfeiture without proof of damage from deceit).

**18.** J.P. Stevens & Co. v. Lex Tex Ltd., Inc., 747 F.2d 1553, 1559 (Fed.Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); see also, 12 Williston on Contracts § 1487A (W.H.E. Jaeger, 3d ed. 1970).

**19.** O'Brien Gear & Mach. Co. v. United States, 591 F.2d at 672.

**20.** Law v. United States, 195 Ct.Cl. 370, 441 (1971) (citing New York Market Gardeners' Ass'n v. United States, 43 Ct.Cl. 114, 138 (1908)).

**21.** See Brown v. United States, 207 Ct.Cl. 768, 524 F.2d 693 (1975) (Government permitted to cancel a contract because the plaintiff had been found to have fraudulently obtained a contract under 18 U.S.C. § 1001, which imposes criminal sanctions); United States v. Acme Process Equip. Co., 385 U.S. at 145, 87 S.Ct. at 355 (Although the Anti-Kickback Statute, 41 U.S.C. § 51 (1970) did not expressly provide for cancellation, the Court held that Congress did not intend to preclude the civil sanction of cancellation if it effectuated the purpose of the Act).

**22.** Everman Nat. Bank v. United States, 5 Cl.Ct. 118 (1984), aff'd, 756 F.2d 865 (Fed.Cir.1985).

dent, are: (i) a false representation; (ii) knowledge of its falsity or other evidence of an intent to deceive; and (iii) reliance.[23] To be material, the misrepresentation must go to the essence of the transaction; it is more than a misrepresentation, deliberate or innocent, of an immaterial fact. Causation must be shown. "It must be proved that the party was in fact deceived by the misrepresentation and relied upon it in entering into the transaction." [24]

In this case, misrepresentation of material fact is not established under these standards. The false certification by Marvin Daniels in the Request for Guarantee did not induce county supervisor Wysock to sign the Contract of Guarantee. The conduct of the participants leading up to the May 1, 1980, closing does not establish the elements of fraud and misrepresentation that would void the Contract of Guarantee.

## LACK OF AUTHORITY

From inception, this case has involved the issue of whether the failure of the parties to comply with statutory and regulatory requirements of the EE program precludes recovery under the Contract of Guarantee. Defendant's renewed motion for summary judgment raised this matter, but disposition of the claim at that time was prevented because many issues of material fact remained in dispute.

■ The facts developed at trial disclose a course of conduct that renders execution of the Contract of Guarantee and the Lender's Agreement by county supervisor Wysock beyond the scope of his authority in the EE program. The EE loan program and the commitment of the United States in the Contract of Guarantee were never intended to extend to a closing where, as here, the actions of the borrower, the lender, and the county supervisor made a farce of compliance with law and the procedures that had been promulgated to protect the interest of the United States. The participants engineered this transaction in an atmosphere where informality and unwarranted trust were substituted for business practices standard in arms length dealing. Regulatory safeguards were neglected or ignored.

The May 1, 1980, closing was extremely casual. The Bank's entire effort for its consideration and approval of the elements involved in FmHA's guaranteed loan application procedure took less than 2 hours. In contrast, Marvin Daniels had participated in only two other FmHA transactions, and they took from 6 months to 1 year to bring to closing.

All significant papers involved in the closing, including the Lender's Agreement and the Contract of Guarantee, had been prepared by the borrower, after consultation with the county supervisor. In the transaction, Royce Moffett did not disclose to the Bank, and the Bank made no effort to ascertain, that part of the herd intended to be collateral for the loan had been pledged as security for Hubert Moffett's loan. The Bank was not told, and did not inquire, about Royce Moffett's status as a co-obligor on that loan. Nor did the Bank know on May 1, 1980, that Royce Moffett's herd at Springfield, which was pledged as security, had been quarantined for brucellosis since March 15, 1979.

Between February 26, 1980, and the closing on May 1, 1980, the herd intended to be security for the loan had been decreased substantially. This condition was recognized as not unusual in a cow/calf operation, but none of the participants at the closing made an effort to ascertain the current status of the herd count. Even if it is assumed that the requirement for a "current" chattel appraisal could be stretched to include the May 20–21, 1980, inspection by the Bank, no adequate count of the security herd was made at that time, nor indeed at any time before or after the closing on May 1, 1980.

In an evaluation of an application, the county supervisor is required to make an independent investigation and to review the appraisal of the chattel property to determine whether there is sufficient collateral.

---

**23.** *La Crosse Garment Mfg. Co. v. United States,* 193 Ct.Cl. 168, 432 F.2d 1377 (1970).

**24.** J.D. Calamari & J.M. Perillo, *Contracts* §§ 9–15 (2d ed. 1977).

No appraisal of the security herd was made by Christopher Wysock. He was told that the "appraisal" in the file had been written by Royce Moffett. He was aware that the Bank's signature on the Request for Guarantee did not accurately reflect an appraisal on February 26, 1980, or at any other time. County supervisor Wysock clearly could not and did not "evaluate" a complete application.

The Bank was responsible to see that all requirements for making the loan were satisfied. The Bank certified that it was unwilling to make the loan without the FmHA guarantee. In actuality, from February 26 through May 1, 1980, Royce Moffett was not at the lending limits for his account. This information was not told to the FmHA. The Bank also was required to see that all available collateral was pledged, and maintained, so as to protect the interest of the FmHA. There was no compliance with FmHA regulations in this regard. At the closing, the Bank completely abdicated its role as a responsible lender.

It is elementary in our system of jurisprudence that an administrative official can exercise only the authority that has been conferred upon such official, and that the Government is not bound by the unauthorized actions of its agents.[25]

In *Federal Crop Insurance Corp.* the Supreme Court stated:

> ... Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.... And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.[26]

In this case, all individuals involved in the closing have acted improperly. The borrower withheld material information. The Bank failed to comply with the regulations governing EE loans. Marvin Daniels did not do all that a prudent and reasonable banker could be expected to do.[27] County supervisor Wysock executed the contract documents under circumstances that obviously did not meet the requirements of the controlling regulations, and in doing so he acted beyond the scope of his authority. The maxim that the United States is not bound by its agents acting beyond their authority and contrary to regulation is well established.[28]

■ Plaintiff contends the Contract of Guarantee is subject to challenge only on the basis of fraud and misrepresentation because the Act constitutes a waiver by Congress of any right to challenge the contract on any other basis. Plaintiff also asserts that the review by FmHA State Office Management Assistant Genie Hanes and FmHA District Director Paul Scott of the Baca County Royce Moffett loan application file, without adverse comment, also demonstrates that the right to challenge the transaction has been waived. A further waiver is found by plaintiff in a denial on July 10, 1981, by the Acting State Director of a request from county supervisor Kasselder for an investigation of the loan because of possible falsification of the application documents. The Acting State Director denied the request at that time "to allow the Lender an opportunity to service their loan." These arguments lack merit.

The Act in § 206 authorizes the issuance of a loan guarantee when the confidence of the lender in the ability of the applicant to repay is deemed by the Secretary to be adequate to protect the Government's interest. The implementing regulations spec-

---

**25.** *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922, 925 (1972).

**26.** 332 U.S. at 384, 68 S.Ct. at 3; *see also Prestex, Inc. v. United States,* 3 Cl.Ct. 373, 377 (1983), *aff'd,* 746 F.2d 1489 (Fed.Cir.1984) (Government not bound by acts of agent beyond agent's actual authority).

**27.** *See, e.g., Security State Bank v. United States,* 221 Ct.Cl. 942 (1979) (lender's obligation on contract of guarantee for emergency livestock loan).

**28.** *Yosemite Park & Curry Co. v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978).

ify numerous determinations that must be made before the confidence of the lender may be deemed "adequate" to protect United States interests. The trial established that the Bank, the borrower, and the Government's representative did not follow those regulations. Any action taken by Mr. Wysock to issue the Contract of Guarantee contrary to the material safeguards in the statutes and implementing regulations renders that Contract of Guarantee unenforceable.[29]

The State Office review of the Royce Moffett loan application file did not result in an approval of the failure to obtain a current appraisal of the chattel property, and does not amount to a waiver that would bar examination into violation of regulatory procedures. Ms. Hanes advised Mr. Wysock that he "had better get somebody to sign off on that appraisal, other than Royce Moffett." Paul Scott did not find that the county supervisor had authority to issue the Contract of Guarantee in the absence of a valid current appraisal. Neither Mr. Scott nor Ms. Hanes had any authority to approve the issuance of a Contract of Guarantee in the absence of compliance with the requirement for a current appraisal of chattel property.

■ Deferment of an investigation in 1981 into possible falsification of loan documents does not tend to establish that execution of the Contract of Guarantee complied with applicable regulatory requirements. Nor does the deferment constitute a waiver of defendant's right to contest procedural irregularity. The FmHA State Office was proceeding on the assumption that the contract was in existence and was operative at that time. FmHA's subse-

quent administrative proceedings on the Bank's Report of Loss also did not challenge the validity of the Contract of Guarantee. Such consideration at FmHA state levels are not waivers of defendant's right to challenge in subsequent judicial procedures the failure to comply with statutory and regulatory criteria.

■ It is well established that estoppel cannot be applied against the Government on account of unauthorized statements or acts of an officer or employee who is without authority.[30] The county supervisor had no authority to waive the requirements of the EE loan program which were at the core of the FmHA procedural safeguards. Defendant is not estopped from showing such lack of authority to act.

The Supreme Court, as to estoppel, has stated that "however heavy the burden ... the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.[31] The Government may not be estopped on the same terms as other litigants.

■ The doctrine of equitable estoppel in an appropriate case may prevent the United States from denying the existence of a contractual agreement.[32] For the doctrine of equitable estoppel to be applied, however, the facts must show the following elements to be present: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true fact; and (4) he must rely on the former's conduct to his injury.[33]

**29.** *E.g., New England Tank Indus. v. United States,* 861 F.2d 685 (Fed.Cir.1988) (Government's exercise of option void), *reh'g denied,* 865 F.2d 243 (1989); *Dahl v. United States,* 695 F.2d 1373, 1379 (Fed.Cir.1982) (FmHA county supervisor lacked authority to bind the Government to repay interim financing); *Schoenbrod v. United States,* 187 Ct.Cl. 627, 410 F.2d 400 (1969).

**30.** *L.B. Samford, Inc. v. United States,* 187 Ct.Cl. 714, 410 F.2d 782, 788 (1969).

**31.** *Heckler v. Community Health Services,* 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

**32.** *Manloading & Management Assoc., Inc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (1972); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 98 F.Supp. 757, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951).

**33.** *Emeco Indus., Inc. v. United States,* 202 Ct.Cl. 1006, 485 F.2d 652, 657 (1973); *United States v.*

Mr. Wysock's participation in the preparation of the application documents and in the closing, and the review by the FmHA District Director, are not actions that may serve as the basis for invoking the doctrine of estoppel. Certainly, the Bank can not be heard to say that it was ignorant of the facts. The Bank is obligated to know the requirements of the regulations, and to be cognizant of the commercial considerations related to a loan to Royce Moffett.

None of the FmHA personnel involved in this transaction were authorized to close a loan guarantee contract in the absence of the Bank's appraisal of the security property. People who deal with the Government are expected to know the law and may not rely on the conduct of government agents that are contrary to law.[34] The necessity to ensure that governmental agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, are principles that militate against any estoppel on the facts of this case.

NEGLIGENT SERVICING

The Contract of Guarantee and the Lender's Agreement provide that the contract will be unenforceable by lender "to the extent any loss is occasioned by ... negligent servicing or failure to obtain the required security ..." These issues were addressed at length at trial, and in the parties' posttrial briefing. The Facts portion of this opinion includes information relevant to these issues. The foregoing analysis on the scope of authority, and the conclusion that the Contract of Guarantee is unenforceable by the Bank, are dispositive of plaintiff's claim. A detailed examination of the negligent servicing issues is neither necessary nor warranted.

██ It is clear that the Bank failed to maintain adequate records and that the Bank disregarded many of its most basic servicing obligations. In this case, as detailed in defendant's posttrial briefs, the Bank's negligence in servicing the loan was pervasive to such extent that the FmHA is relieved of any liability.[35]

CONCLUSION

On the basis of the foregoing findings of fact and opinion, it is concluded that the Contract of Guarantee is not enforceable and that plaintiff is not entitled to recover. The Clerk is directed to dismiss the complaint. Defendant may recover its costs.

---

*Georgia Pacific Co.,* 421 F.2d 92, 96 (9th Cir. 1970).

**34.** *Heckler v. Community Health Services,* 467 U.S. at 63, 104 S.Ct. at 2225.

**35.** *Brunswick Bank & Trust Co. v. United States,* 707 F.2d 1355, 1363 (Fed.Cir.1983).