The LONG ISLAND SAVINGS BANK, FSB, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–517C.

United States Court of Federal Claims.

Dec. 9, 2002.

Russell E. Brooks, Milbank, Tweed, Hadley & McCloy LLP, New York City, and Richard C. Tufaro and David S. Cohen, of counsel, for the plaintiffs.

Jerome A. Madden, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom on the brief were, Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, for the defendant. Paul G. Freeborne, John Jay Hoffman, and Jonathan S. Lawlor, of counsel.

## OPINION

MARGOLIS, Senior Judge.

Plaintiffs brought this action against the United States contending that they had an enforceable contract with the Government to treat plaintiffs' supervisory goodwill, which was created as a result of an acquisition of a failed thrift, as regulatory capital. As regulatory capital, the plaintiffs were permitted to amortize the goodwill over a forty-year period. Plaintiffs claim that, in enacting of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Congress breached that contract by eliminating plaintiffs' ability to count goodwill as regulatory capital. *See generally, United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

This case is before the Court on defendant's motion for summary judgment and plaintiffs' cross-motion for summary judgment on defendant's counterclaims and affirmative defenses pursuant to United States Court of Federal Claims ("RCFC") Rule 56. Plaintiffs' complaint states that the Government breached its contractual obligations with plaintiffs, and plaintiffs now seek compensation of $625 million in amortized goodwill regulatory capital. The Government's summary judgment motion counterclaims that: (1) plaintiffs' claims are forfeited under a special plea in fraud pursuant to 28 U.S.C. § 2514; (2) common law fraud renders the contract unenforceable; (3) the contract should be rescinded and $122 million repaid to the Government; and (4) plaintiffs' prior material breach precludes damages. This Court, pursuant to RCFC 56(g), granted additional discovery, and both parties submitted additional briefing. After oral argument, and for the reasons discussed herein, the Government's motion is denied, and plaintiffs' motion is granted.

## FACTS

### A. The Long Island Savings Bank and the Government's Assistance Agreement

In 1982, the Long Island Savings Bank ("LISB") was converted from a New York-chartered mutual savings bank into a federally chartered savings bank whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC").[1] LISB was created as a result of the 1983 merger

---

1. From December 1982 through August 1989, LISB was subject to regulation and supervision by the FHLBB. Since August 1989, LISB has been subject to regulation and supervision by the Office of Thrift Supervision ("OTS"), the successor to the FHLBB, whose purpose is to maintain administrative enforcement proceedings.

between the Long Island Savings Bank of Centereach, FSB ("Centereach"), and the Long Island Savings Bank of Syosset, FSB ("Syosset"), both of which James J. Conway, Jr. served as Chairman and Chief Executive Officer ("CEO").

In 1983, after negotiations, the Federal Savings and Loan Insurance Corporation ("FSLIC") transferred Suffolk County Phoenix, a failing thrift franchise, to LISB, quadrupling LISB's branch network and tripling its assets to approximately $3 billion. On August 17, 1983, the FSLIC and LISB entered into an Assistance Agreement that contained restrictions pertaining to the thrift's officers and directors, and federal guidelines and regulations governing the business aspects of the new thrift.

Under the terms of the Assistance Agreement, LISB paid nothing for the franchise, but contributed $100,000 into the franchise's controlling subsidiary, Centereach. FSLIC also infused a total of $122 million into Centereach. From December 1982 until May 1992, Conway served as Board of Trustees Chairman and CEO of LISB.

## B. Conway's Law Firm and his Compensation Scheme

From September 1975 until his retirement in June 1992, Conway was a partner and stockholder of Conway & Ryan PC ("the firm").[2] In 1982, Conway stopped practicing law and engaging in other professional services for the law firm. From September 1975 until December 1984, Conway owned 65% of his law firm's outstanding stock. In December 1984, Conway transferred 51% of the firm's stock to his daughter, Susan C. Petrelli. Petrelli became a salaried officer and director of the firm, serving until December 1990. She did not pay her father for the stock, but rather paid the firm $51,000. Conway's daughter-in-law, Denise Whalen, was also a salaried officer and director of the firm, serving from January 1987 until December 1990. From December 1984 until January 1990, Conway's ownership interest

was 9%; however, he continued to exercise control over 60% of the firm's stock. Conway retired from the firm in June 1992.

From 1982 to 1991, Conway caused LISB to utilize the firm as LISB's sole mortgage loan closing counsel, and he ensured that the firm had the exclusive right to represent LISB in connection with all mortgage closings without action from the Board of Directors. During this period, the firm collected approximately $20 million in fees from over 25,000 residential mortgage loan closings, which represented 80% to 90% of the firm's income. LISB did not pay the loan closing fees, rather the borrowers did. Of this amount, 60%—or approximately $11.3 million—was paid to Conway and his family members who worked for the firm. Conway received payments and benefits from the those fees both directly from his law firm and through his daughter or daughter-in-law. Conway did not provide professional services to the firm between 1983 and 1990, but he received an annual salary and compensation from the firm during that time period.

Conway did not disclose to LISB that he was being compensated by the firm from income that the firm received for providing services to LISB. When asked by LISB whether LISB had to disclose compensation received by Conway from his firm in an Annual Report statement,[3] Conway indicated that he received less than $500,000 annually from the firm, thereby exempting LISB from disclosure. In 1986 and 1988, the FHLBB questioned LISB regarding LISB personnel that had a direct or indirect business interest with LISB and the nature, type, and volume of those business interests. At each of those times, Conway described his relationship as retaining "an interest in a law firm that presently renders service to [LISB] and receives remuneration from outside income of said firm."

In 1990, LISB's outside counsel discovered Conway's compensation from the firm. Conway would not disclose to LISB information regarding his financial arrangements with

---

2. In August 1985, Conway & Ryan PC changed its name to Power, Meehan & Petrelli, PC. In 1990, the firm changed its name again, this time to Power, Meehan & Power, PC.

3. In accordance with 12 C.F.R. § 563.45.

the firm. He did indicate to LISB's counsel, however, that his compensation from the firm was part of a ten-year payout arrangement. No such arrangement actually existed. Conway attempted to enjoin LISB's outside counsel from disclosing the financial information that they had on the grounds that attorney-client privilege prohibited disclosure. In 1990, the New York trial court found that Conway made false statements about his financial arrangement with the firm to LISB's counsel and issued a gag-order regarding Conway's finances pending appeal. On March 22, 1993, the Appellate Division of the New York Supreme Court affirmed the trial court's decision. LISB incurred approximately $1 million in legal expenses as a result of this and related litigation.

In August 2000, the Appellate Division of the Supreme Court of the State of New York, upheld the disbarment of Conway. The court determined that "while chairman of the board and chief executive officer of a savings bank, [Conway] engaged in a scheme of illegal kickbacks, using his daughter and daughter-in-law as conduits to circumvent Federal law prohibiting him from receiving compensation from his former law firm, which relied on the bank for approximately 90% of its business."

## C. Office of Thrift Supervision Investigation

In March 1993, the Office of Thrift Supervision commenced an investigation into Conway's compensation scheme with the firm. In September 1993, OTS and Conway initiated settlement discussions whereby Conway agreed to pay LISB $1.3 million in restitution per issuance of a consent prohibition and cease-and-desist order, signed February 1994. The consent order banned Conway from the thrift and banking industry. In 1998, Conway pled guilty to violating 18 U.S.C. § 215.[4]

## DISCUSSION

In the absence of genuine issues of material fact, this Court may award summary judg-

ment to a party according to the law. RCFC 56(c). In reaching summary judgment, the trial court must construe facts and resolve inferences in the light most favorable to the non-movant. *Godley v. United States*, 5 F.3d 1473, 1474 (Fed.Cir.1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The Government contends that the plaintiffs' claims are forfeited in two different, but related, ways. Both deal with alleged fraudulent misrepresentations made by LISB. The Government cites a conflict-of-interest between Conway's relationship with his law firm and his relationship with LISB. Conway allegedly used his position as Chairman and CEO of LISB to make his law firm LISB's exclusive mortgage loan closing counsel and was compensated by his firm for this referral. The Government maintains that it did not know of the relationship when it entered into the Assistance Agreement with LISB and, had it known about the arrangement, it would not have entered into the Agreement.

The arrangement between Conway, his law firm, and LISB provides the Government with two possible defenses to the plaintiffs' claim. First, the Government asserts that the arrangement violated express conditions of the Agreement and that those violations served to forfeit any claims by the plaintiffs based on a Government breach of the Agreement. Second, it contends that, even if the arrangement were not a violation of the Agreement, the plaintiffs would not be able to collect upon the Agreement because the misrepresentation of the arrangement between the entities constituted fraud against the Government. Where fraud is committed against the Government, 28 U.S.C. § 2514 mandates that the claim shall be forfeited.

The essence of this case is whether Conway's improper relationship with the firm tainted the relationship LISB had with the firm. The Government contends that because Conway was both a partner in the law firm and the CEO and Chairman of LISB,

---

**4.** 18 U.S.C. § 215 (Receipt of commissions or gifts for procuring loans) states that a director or officer commits a crime when he corruptly solicits or corruptly accepts anything of value from another person or entity intending to be rewarded in connection with any business or transaction of an insured depository institution.

his actions, and thus this arrangement, should be imputed to LISB. Plaintiffs argue that this Court must distinguish between Conway placing himself personally in a conflicting relationship and his role in entering into the Assistance Agreement on behalf of LISB. This Court is being asked to determine whether a distinction between Conway and LISB exists. The Court will first examine whether the arrangement was a direct violation of the Assistance Agreement, then it will look at whether it constituted fraud against the Government, and, finally, it will address the issue of whether Conway's conduct in this arrangement should be imputed to LISB.

## I. LISB's Representations Under the Assistance Agreement

The Government contends that LISB violated the Assistance Agreement in several ways and that those violations rendered the contract void, thereby causing the plaintiffs to be forced to forfeit any claims based on a Government breach of the Agreement. Sections 11(b)(5) and 8(h) of the Assistance Agreement include an express warranty by LISB that LISB was not in violation of any applicable statutes or regulations at the time of entering into the Agreement and a promise that LISB would remain in compliance with such statutes and regulations. The Government argues that LISB disregarded those provisions by acting in violation of the Real Estate Settlement Procedures Act ("RESPA") of 1974, § 8, as amended, 12 U.S.C. § 2607, and of 12 C.F.R. §§ 563.40 and 563.17 (1983). Plaintiffs asserts that LISB complied with all applicable statutes and regulations and, therefore, was not in violation of the Assistance Agreement at any time. This Court will examine whether the arrangement between Conway, his law firm, and LISB caused LISB to be in violation of the Agreement.

## A. Sections 11(b)(5) and 8(h) of the Assistance Agreement

In the Assistance Agreement, LISB expressly warrants both that it was not violating any statutes or regulations at the time that it entered into the Agreement and that it would continue to comply with such rules.

Section 11(b)(5) of the Agreement states that

*LISB represents and warrants that:* ... *LISB is not in violation of any applicable statutes, regulations or orders* of, or any restrictions imposed by, the United States of . America or any state, municipality or other political subdivision or any agency of the foregoing public units, *regarding the conduct of its business and the ownership of its properties,* including without limitation, all applicable statutes, regulations, orders and restrictions relating to savings and loan associations, equal employment opportunities, employment retirement income security, and environmental standards and controls where such violation would materially and adversely affect LISB's business, operations or condition, financial or otherwise.

Assistance Agreement § 11(b) (emphasis added).

Section 8(h) mandates that LISB will continue to be in accord with the applicable statutes and regulations:

*CENTEREACH and LISB will, and will cause any Service Corporation of CENTEREACH or LISB to, comply in all material respects with all applicable statutes, regulations and orders* of, and all restrictions imposed by, the United States of America and any state municipality or other political subdivision or any agency of the foregoing public units, *in respect of the ownership of its properties and conduct of its business,* including, without limitation, all applicable statutes, regulations, orders and restrictions relating to equal employment opportunities, employment retirement income security and environmental standards and controls; provided, however, that nothing contained in this § 8(h) shall require CENTEREACH or LISB or any Service Corporation of CENTEREACH or LISB to comply with any law so long as the validity or applicability of such law shall be contested in good faith.

Assistance Agreement § 8(h) (emphasis added).

The Government contends that Conway's dual relationship caused LISB to violate

RESPA and 12 C.F.R. §§ 563.40 and 563.17. By doing so, the Government argues that LISB acted in violation of sections 8(h) and 11(b)(5) of the Agreement, thereby causing a breach that had the effect of absolving the Government of its responsibility to perform under the Agreement.

## B. Prohibitions Under RESPA, 12 U.S.C. § 2607 and 12 C.F.R. § 563.40

█ The Government argues that Conway's compensation scheme violated RESPA, 12 U.S.C. § 2607 and 12 C.F.R. § 563.40, thereby causing LISB to violate Sections 11(b)(5) and 8(h) of the Agreement. RESPA §§ 2601 *et seq.*, forbids the payment of a kickback for referring to the payor an opportunity to provide a real estate settlement service for a federally related mortgage loan. RESPA § 2607 states:

(a) Business referrals—No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges—No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

(c) Fees, salaries, compensation, or other payments—Nothing in this section shall be construed as prohibiting (1) the payment of a fee (A) to attorneys at law for services actually rendered . . . .

Similarly, 12 C.F.R. § 563.40, which incorporates the applicable provisions of RESPA, states:

(a) Loan procurement fees—No affiliated person of an insured institution may receive, either directly or indirectly, from such institution, any subsidiary thereof, or any other source any fee or other compensation of any kind in connection with the procurement of any loan from such institution or subsidiary thereof.

(b) Kickbacks and unearned fees—The prohibitions contained in sections 8(a) and 8(b) of the Real Estate Settlement Procedures Act of 1974 (Pub.L.93–533) shall apply to any fee, kickback, thing of value, and any portion, split or percentage of any charge, either directly or indirectly, given to or accepted by an insured institution or subsidiary or affiliated person thereof, in connection with any loan on real property made by an insured institution or subsidiary thereof, without regard to whether the loan is within the term "federally related mortgage loan," as defined in section 3(1) of the Act.

A primary purpose of RESPA is to eliminate improper relationships that unnecessarily increase the cost of settlement services. RESPA § 2601(b)(2). There are a multitude of relationships in the banking industry that provide for legitimate compensation for services rendered; others are entered into for the purpose of eliciting kickbacks. *See e.g., Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1162 (7th Cir.1997) (disparity in compensation arrangement supported inference of kickback); *DeLeon v. Beneficial Const. Co.*, 998 F.Supp. 859, 864 (1998) (receipt of fee without providing broker services sufficient to constitute a kickback); *see also Weil v. Long Island Sav. Bank*, 77 F.Supp.2d 313, 328 (1999) (Conway's acceptance and his firm's payment of fees paid by mortgage loan borrowers violated RESPA).

## C. Legal Distinctions of LISB's Relationships

Conway and his firm's impropriety under banking laws is evident. *See Weil v. Long Island Sav. Bank*, 77 F.Supp.2d at 328. However, the issue that underlies the Government's defense to the action brought by LISB is whether the law prohibited LISB's relationship with Conway and the firm. Helpful in this determination are the analogous comments and fact examples found in the RESPA provisions that deal with the Housing and Urban Development ("HUD"), which are essentially identical to those adopted in the banking regulations. *Com-*

*pare* 24 C.F.R. § 3500 (1983), *with* 12 C.F.R. § 563.40 (1983).

The regulations that have been adopted by HUD which are associated with those RESPA provisions provide guidance in the application of the law to specific factual circumstances, and provide examples of how the provisions would apply to different factual situations. This Court, as an initial matter, will analyze the facts in this case by comparison to those situations envisioned in the regulations: Conway, a partner in the law firm, directed LISB borrowers to the law firm that provided those borrowers with mortgage closing services. The firm paid its attorneys and partners, including Conway, based on the firm's revenue from the fees charged to the borrowers. This is an analogous arrangement to one described in the regulation. *See* 24 C.F.R. § 3500, App. B (Fact 10). Under the HUD regulations, while a payment to Conway from the firm would violate the regulation, the relationship between LISB and the firm would not. *See id.* (Comment 10). Thus, under RESPA § 2607 and 12 C.F.R. § 563.40, a legal distinction would be made between LISB and Conway.

Further, the facts indicate that the firm did not kickback money to LISB, rather the firm paid Conway from profits made from the borrowers. Indeed, had Conway not accepted compensation related to mortgage closing services of LISB's borrowers, but the relationship between LISB and the firm was otherwise the same, no impropriety would exist. It was not LISB's relationship with the firm that was improper. LISB was not violating RESPA or 12 C.F.R. § 563.40 and, therefore, LISB was not operating in an unsafe and unsound manner under 12 C.F.R. § 563.17. Consequently, LISB did not violate the provisions of the Assistance Agreement.

#### D. Applicability of 12 C.F.R. § 563.40 to LISB's "Affiliated Persons"

■ Under 12 C.F.R. § 561.29, Conway is considered an " 'affiliated person' of an in-

sured institution" because Conway was the CEO of LISB, *see* 12 C.F.R. § 561.29(a). Conway's law firm is also considered an "affiliated institution" because it was a business organization in which Conway, LISB's CEO, was a general partner, *see* 12 C.F.R. § 561.29(d)(2).[5]

Defendant argues that, as Conway is an "affiliated person" of LISB, he was prohibited from accepting compensation pursuant to 12 C.F.R. § 563.40. It asserts that Conway's acceptance of such compensation created a violation of the terms of the Assistance Agreement on the part of LISB. Plaintiffs counter that 12 C.F.R. § 563.40 relates to affiliated persons receiving kickbacks in return for banks granting mortgage loans, and as LISB itself neither gave nor received kickbacks related to granting mortgage loans, 12 C.F.R. § 563.40 is inapplicable to LISB and, consequently, LISB did not violate 12 C.F.R. § 563.40.

The application of 12 C.F.R. § 563.40 to the various relationships indicates that neither Conway (as LISB's CEO) or his law firm (Conway as the firm's partner) received compensation from LISB in exchange for LISB granting a loan. Here LISB never compensated Conway or his firm for granting a mortgage loan to a borrower. Rather, the firm was compensated by LISB's borrowers for doing legitimate mortgage closing services, and Conway was then compensated by his firm. Although Conway and his firm are "affiliated persons," LISB did not receive or pay either Conway or his firm for granting loans to its borrowers. Therefore, the Court finds that Conway and his firm's status as "affiliated persons" did not cause LISB to be in violation of the Assistance Agreement.

### II. Fraud

The Government contends that, even if Conway's violations of law did not a constitute a violation of the Assistance Agreement

---

5. 12 C.F.R. § 561.29 states:

Affiliated person.—The term "affiliated person" of an insured institution [LISB] means the following:

(a) A director, officer, or controlling person of such institution [Conway as LISB's CEO];
. . .

(d) Any corporation or organization (other than the insured institution or a corporation or organization through which the insured institution operates) of which a director, officer or controlling person of such institution: . . .

(d)(2) Is a general partner . . . [Conway's law firm]

by LISB, plaintiffs' claims for recovery were nevertheless forfeited pursuant to 28 U.S.C. § 2514 because Conway, as LISB's Chairman and CEO, committed fraud upon the Government in the formation and performance of the Assistance Agreement, and that, therefore, Conway's conduct should be strictly imputed to LISB. The Court will first examine the alleged fraud and then will examine the imputation.

■ 28 U.S.C. § 2514, Forfeiture of Fraudulent Claims, states:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 does not define the applicable elements of fraud. Instead, the United States Court of Federal Claims has approached the issue of fraud in forfeiture of claims cases on a case-by-case basis and has used the four common law fraud elements as a prerequisite to establishing a special plea in fraud. *See Landmark Land Co. Inc. v. United States*, 46 Fed.Cl. 261, 274 (2000), *aff'd in part, remanded on other grounds*, (Fed.Cir. July 24, 2001), *rehr'g and rehr'g en banc denied*, (Nov. 15, 2001); *BMY–Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed.Cl. 109, 128 (1997); *Colorado State Bank of Walsh v. United States*, 18 Cl.Ct. 611, 629–30 (1989), *aff'd*, 904 F.2d 45 (Fed. Cir.1990). To establish the affirmative defense of fraud, the Government must, therefore, prove by clear and convincing evidence: 1) misrepresentation of a material fact; 2) knowledge and intent to deceive or a reckless state of mind; 3) justifiable reliance on the misrepresentation by the deceived party; and 4) injury to the party deceived through reliance. *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984) (patent case); *Landmark Land Co., Inc.*, 46 Fed.Cl. at 274; *Colorado State Bank*, 18 Cl.Ct. at 629–30.

■ This Court has held that because finding fraud during the performance of a contract is not necessarily obvious and dependent on specific circumstances, the Government must prove all four elements when asserting a special plea in fraud claim to ensure that it has indeed relied on the alleged fraud and incurred a related injury. *First Federal Sav. Bank of Hegewisch v. United States*, 52 Fed.Cl. 774, 790–91 (2002). Otherwise, the Government would be able to avoid legitimate contractual claims against it by simply pointing to unrelated events that occurred during the performance of the contract that resulted in no harm to the Government. *Id.* This is unlike fraud committed in the presentation of a claim where the reliance and harm is inherent since it is the claim itself that is fraudulent. *Id.* Thus, this Court can concurrently analyze the Government's 28 U.S.C. § 2514 and common law fraud arguments.

This Court has applied two different lines of cases defining a special plea in fraud, both of which have been supported by the Federal Circuit. As discussed above, the first line of cases define a special plea in fraud as containing the same elements of proof as common law fraud: misrepresentation of fact, knowledge, reliance, and injury. The second line of cases ascribes to the special plea in fraud only two elements: knowledge and intent to deceive. *See Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed.Cir.2001) (citing *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed.Cir.1998)); *Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed.Cir. 1994) (citing *McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996, 1004 (1982)); *Supermex, Inc. v. United States*, 35 Fed.Cl. 29, 42 (Fed.Cl.1996) (Court stated it was unclear whether two or four elements were required to prove fraud, but only two were needed in that case). Because this Court ultimately finds that the Government has not established elements common to both lines of analysis, the Government's special plea in fraud fails under both.

### 1. Misrepresentation of Fact

■ The Government must first prove that there has been a misrepresentation of material fact. As Chairman and CEO of

LISB, Conway had the authority to enter into the Assistance Agreement. Conway did so knowing his conflicting dual relationship with his firm and LISB prohibited him from entering into the Assistance Agreement and from receiving compensation from his firm. The State of New York courts determined that if Conway were not LISB Chairman and CEO, he and the firm would not have been able to "engage[ ] in a scheme of illegal kickbacks, ... circumvent[ing] Federal law prohibiting him from receiving compensation from his former law firm, which relied on the bank for approximately 90% of its business." The evidence shows that the perpetrators of the scheme, Conway and his firm, misrepresented information and benefited from Conway's arrangement, whereas LISB received no improper benefit from Conway's conflict. Indeed, LISB's independent efforts to disclose Conway's scheme support the conclusion that, had LISB known of Conway's conflict-of-interest, it is unlikely that LISB would have permitted Conway from misrepresenting his personal compensation scheme.

### 2. Knowledge of Misrepresentation

The Government contends LISB had knowledge of Conway's compensation scheme; however, it also claims that, even if it were found that LISB did not have knowledge, LISB's lack of knowledge would be irrelevant because Conway's conduct is strictly imputed to LISB. Although this Court will address the issue of imputation below, for the purpose of determining whether LISB committed fraud in connection with the Assistance Agreement, this Court finds that the LISB's knowledge of a misrepresentation is pertinent in understanding the circumstances under which the allegations of fraud are being made.

It was not until almost nine years into the performance of the Assistance Agreement that LISB's outside counsel discovered the conflict-of-interest and, upon doing so, questioned Conway regarding his relationship with the firm. Conway made misrepresentations to LISB to conceal his conflict-of-interest by telling outside counsel that his compensation from the firm was part of a ten-year payout arrangement and then refusing to disclose information regarding his financial arrangements with the firm. When LISB attempted to rectify Conway's fraud, Conway attempted to enjoin LISB from disclosing his finances. LISB incurred approximately $1 million in legal expenses derived from this and related litigation. But for LISB's attempt to have Conway disclose his conflict-of-interest, the Government might still be unaware of its existence.

The Government points to statements of LISB executives to establish that others in LISB knew of Conway's compensation arrangement at the time LISB entered into the Assistance Agreement:

Q:  Do you know if the members of the board at that time knew that you had an interest in the law firm?

. . .

A:  ... The only ones I can absolutely be sure of would be Mr. Viklund [who signed the management questionnaires that showed Conway retaining an interest in the law firm] and Mr. Buxton [who handled the law firm's insurance]. . . .

Aug. 17, 2000 Deposition of James J. Conway, Jr., at 182.

Q:  Do you think Mr. Conway should have told the board he was receiving nearly $500,000 from the law firm?

A:  I think he informed everybody.

Q:  You were aware of that as a member of the board?

A:  Yes.

Sept. 29, 2000 Deposition of Edwin M. Canuso, at 78.

Q:  Do you know how much of this million dollars that [Conway's daughter and daughter-in-law] made occasionally came from business with the bank?

A:  I assume.  The law firm was doing most of its business with the bank.  I'm assuming that's where the money came from.

Q:  Do you think Conway should have told the board that his [daughter and daughter-in-law] were earning so much money based on business with the law firm and ·the bank?

A: It was their business. I mean, I can't say that it was their responsibility to let us know how much money they were making.

Sept. 29, 2000 Deposition of Edwin M. Canuso, at 84–85.

While these statement show LISB knew that Conway was receiving compensation from his firm, these statements do not establish that others in LISB knew that Conway's firm compensation was improper. Rather, these same LISB executives indicate that they were unaware of any impropriety.

Q: Based on the information that you've just read now in various documents, do you believe that Mr. Conway kept the board properly apprized (sic) of his activities or should he have given you more information?

A: We were apprized (sic) properly. Whether or not it was correct or not, how can we judge? I mean, we received the documentation accordingly and we accepted it on face value.

. . .

Q: Do you believe there's any information Mr. Conway kept from the board that he should have disclosed?

A: I wouldn't know that.

Sept. 29, 2000 Deposition of Edwin M. Canuso, at 76–77.

Q: Did the board of directors ever ask Conway about his interest in the law firm?

A: To my knowledge, no.

Q: Do you know why not?

A: It was just the accepted practice.

. . .

Q: If Mr. Conway was receiving income from the law firm directly related to the services the firm was providing for the bank, would that create a conflict-of-interest? . . .

A: No.

Oct. 25, 2000 Deposition of George Irvin, at 41–43.

Although LISB knew Conway was being compensated by his firm, this Court cannot conclude that LISB knew that the arrangement was improper, and, therefore, a misrepresentation. Also, the extent to which Conway acted to conceal his conflict from LISB once LISB discovered Conway's compensation arrangement is significant in establishing LISB's knowledge of the impropriety of Conway's compensation. The Government has not established that LISB's knowledge of Conway's compensation equates to LISB's knowledge of a misrepresentation.

### 3. Justifiable Reliance

A primary function and purpose of the laws and agencies responsible for regulating the banking industry is to ensure the safe and sound management of banks and the money the public entrusts to banks. Not only is this generally apparent within the law, but within the Assistance Agreement. The Government contracted for full disclosure of any conflicts-of-interest in order to assure the safe and sound management of LISB, and it relied on Conway's statements. The Government thus justifiably relied on Conway's misrepresentation.

It is further apparent that LISB also relied on Conway to disclose his conflict. Indeed, without the action of LISB, there is no evidence that the Government would have independently discovered Conway's conflict-of-interest. What is clear is that, for Conway to have benefited from his scheme, he needed both the Government and LISB to rely on his deception.

### 4. Injury

It is sufficient that the "injury and the damages to the sovereign are presumed in the breach of the bond of public trust." *Supermex, Inc. v. United States*, 35 Fed.Cl. 29, 42 (Fed.Cl.1996) (bribing public officials is an inherent public harm). However, it is difficult for the Court to accept the Government's contention that plaintiffs' conduct caused injury to the public's trust in banks, particularly when the Government continued to accept LISB's performance under the contract.

The alleged public injury is questionable because the party that appears to have been actually injured is LISB, which spent over $1 million in litigation resolving issues surrounding Conway's misconduct. Further, LISB fully performed its obligations under the Assistance Agreement, and the Govern-

ment sustained no cognizable injury. This is not a case of conspiracy for corporate benefit, but of concealed misstatements for personal gain.

■ Conway could arrange his scheme only as someone who was authorized to enter into the Assistance Agreement with the Government; however, it would be incorrect to characterize his personal compensation scheme as being authorized by LISB. As LISB's Chairman and CEO, Conway had this authority and acted on behalf of LISB; however, his fraud was not based on the Agreement; rather, the fraud resulted from his compensation arrangement with the firm. Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, was not intended to forfeit an otherwise valid claim merely because in some other unrelated transaction a person defrauds the Government; rather, it was intended to apply to situations where fraud was committed with regard to the very contract upon which the suit is brought. *See Little v. United States*, 138 Ct.Cl. 773, 778, 152 F.Supp. 84 (1957). Conway's improper compensation relationship with his firm was not related to the Assistance Agreement, and, therefore, to forfeit LISB's claim due to that scheme would not serve to carry out the intentions of the Forfeiture of Fraudulent Claims Act.

Conway used his authority independently and without LISB's knowledge to gain personally from his dual relationship. The Government has not submitted sufficient evidence that other members of LISB knew of Conway's conflict and his compensation scheme to provide a material genuine issue of fact. Conway did so without LISB's knowledge and approval, as evidenced by his concealment of this information from LISB and by LISB's litigation with Conway over disclosure of his compensation. Because the compensation that Conway received from the firm placed LISB in unknowing liability, LISB essentially was used by its own agent, Conway, for his personal gain and not for corporate benefit. *See Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 519 n. 12 (1965), *rev'd on other grounds.*

The Court therefore cannot conclude that LISB, as a corporate entity, acted fraudu-

lently. Thus, the question remains whether Conway's conduct alone can be imputed to LISB.

## III. Imputation of Conway's Conduct to LISB

■ A corporation can act only through its officers and agents and, when they are clothed with the authority to act for it, the corporation is responsible for their acts. *Wagner Iron Works v. United States*, 146 Ct.Cl. 334, 174 F.Supp. 956, 958 (1959) (citing *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *Standard Surety & Cas. Co. of New York v. Plantsville Nat. Bank*, 158 F.2d 422 (2nd Cir.1946); *Ralston Purina Co. v. Novak*, 111 F.2d 631 (8th Cir.1940)). Under general rules of agency law, principals are liable even when their agents act fraudulently so long as they are acting with apparent authority. *See American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Anderson v. United States*, 47 Fed.Cl. 438, 448 (2000). For instance, a principal is liable for an agent's fraud, though the agent acts solely to benefit himself, if the agent acts with apparent authority. *See O'Brien Gear & Mach. Co. v. United States*, 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979) (fraud of the plaintiff's president, chief executive officer, and the sole owner of the corporate stock imputed to plaintiff corporation).

■ Imputation of fraud is not, however, automatic. Under the law of imputation, courts impute the fraud of an officer to a corporation only when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *First Federal Sav. Bank of Hegewisch*, 52 Fed.Cl. at 792; *see Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358–59 (3rd Cir.2001). Thus, imputation of an agent's actions to his principal is precluded where the agent's actions are taken for the purpose of defrauding the principal. *Trilon Educational Corp. v. United States*, 217 Ct.Cl. 266, 578 F.2d 1356, 1361 (1978) (noting that an individual's criminal conviction of fraud on an unrelated contract bid that resulted in debarment need not

inevitably be imputed to an affiliated firm). Thus, for there to be strict imputation, the Government must establish that indeed the perpetrator of the fraud acted on behalf of the corporate entity, and not merely for his own personal benefit.

For purposes of imputation, the important distinction is not between LISB and Conway, rather it is between Conway's duties as CEO and Chairman versus his individual conduct. Apparent authority is defined as when a "principal permits the agent to exercise or which he holds [the agent] out as possessing." *Strann v. United States,* 2 Cl.Ct. 782, 789 (1983) (quoting S. Williston, *A Treatise on the Law of Contracts* §§ 277, n. 11 (W. Jaeger 3d ed.1959 and 1982 Supp.); *citing* Restatement (Second) of Agency § 8 (1958)). Determining whether apparent authority exists requires scrutiny into the principal's behavior in the relationship with its agent. *Strann,* 2 Cl.Ct. at 789.

As LISB's CEO and Chairman, it would appear that, in entering into the Assistance Agreement, Conway acted within the scope of his employment. However, the circumstances here show that, once LISB became aware of Conway's compensation scheme, LISB acted to disclose Conway's compensation and Conway fought to prevent LISB from disclosing that information. LISB's independent efforts to disclose Conway's compensation scheme and Conway's efforts to rebuff LISB's efforts weigh heavily in supporting the conclusion that Conway's personal compensation scheme was not authorized by LISB.

■ It is undisputed that Conway, as LISB's CEO and Chairman, had the authority to enter into the Assistance Agreement on behalf of LISB. It cannot be said, however, that LISB authorized or approved Conway's personal compensation scheme with the firm. The fraud here was not in entering into the Assistance Agreement, rather the fraud the Government challenges is with regard to Conway's compensation scheme, an arrangement that was neither found within the scope of Conway's duties as LISB's CEO and Chairman nor approved of by LISB. When an agent's motive and conduct demonstrate that he has abandoned his principal's interest

and is acting to defraud his principal, entirely for his own or another's purpose, his knowledge and misconduct will not be imputed to his principal. *Acme Process Equip. Co. v. United States,* 347 F.2d at 519 n. 12. The rationale for this exception is clear in that the law presumes that the wrongdoer would not perform his usual duty to disclose all material facts regarding his action if such disclosure would reveal the fraud that he committed. This is evidenced by the fact that, had the knowledge that the Government seeks to impute to LISB actually been disclosed to LISB, the success of Conway's scheme would have been impaired.

■ The second part of the imputation test is whether the fraudulent conduct was perpetrated for the benefit of LISB. *Official Committee of Unsecured Creditors,* 267 F.3d at 359. Under this prong, fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation. *Id.; First Federal Sav. Bank of Hegewisch,* 52 Fed.Cl. at 792–93 (adopting the adverse interest exception); *see Crocker v. United States,* 49 Ct.Cl. 85, 1913 WL 1286 (1913) (where an agent goes beyond the scope of his authority and commits a wrong or fraud to accomplish a purpose designedly his own, the principal is not liable).

The Government has not established that LISB benefited, monetarily or otherwise, from Conway's misrepresentation. Only Conway received compensation from his firm. LISB did not pay the loan closing fees or provide the firm with payment, rather the individual borrowers did. There is no evidence that LISB as a corporate entity or that LISB's officers (other than Conway) received compensation under Conway's scheme. The fraud benefited only Conway, his family, and his law firm; it did not benefit LISB.

Because this Court finds that the Assistance Agreement was not *actually* tainted by illegality or impropriety, that is, that the Agreement was used a *tool* of an independent conflict-of-interest, rather than the actual *product* of the conflict, the Court finds that the Agreement is not *void ab initio. Godley v. United States,* 5 F.3d at 1475 n. 1 (noting

that although the court in *K & R Engineering Co. v. United States*, 222 Ct.Cl. 340, 616 F.2d 469 (1980), misread the factual predicate of *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 565, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), it was correct in that, for a contract to be *void ab initio*, the contract must be the actual product of the conflict-of-interest, not an agreement entered into separately from the conflict-of-interest, or condoned by the company whose agent acts with its authority). Here, plaintiffs took action to uncover Conway's conflict-of-interest. Likewise, the Government's assertion that the Agreement is void or voidable because of Conway's misrepresentations is also inapposite because Conway's personal misconduct does not render the Agreement void or voidable. LISB was innocent of the misconduct and complied with banking regulations, and thus, LISB committed no fraud under the Agreement's terms. Lastly, because the contract itself is not tainted by Conway's conflict-of-interest, and has remained pure in formation and performance, rescission would be improper. *See Nebco v. United States*, 23 Cl.Ct. 635, 642 (1991).

## CONCLUSION

For the reasons stated herein, plaintiffs' motion for summary judgment regarding defendant's fraud counterclaims and defenses is granted. Defendant's motion for summary judgment is denied.